# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PATRICK CLEMONS,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )          1:19cv961
                                    )
CITY OF GREENSBORO, et al.,         )
                                    )
                Defendants.         )

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on "Plaintiff's Motion for Leave to File Amended Complaint [and] Memorandum of Law in Support Thereof" (Docket Entry 17) (the "Motion to Amend"). For the reasons that follow, the Court will deny in part and grant in part the Motion to Amend.[1]

---

1 For reasons stated in Deberry v. Davis, No. 1:08cv582, 2010 WL 1610430, at *7 n.8 (M.D.N.C. Apr. 19, 2010), the undersigned Magistrate Judge will enter an order, rather than a recommendation, as to the Motion to Amend. See also Everett v. Prison Health Servs., 412 F. App'x 604, 605 & n.2 (4th Cir. 2011) (explaining that, where the plaintiff "moved for leave to amend her complaint[] . . . to add a state-law claim of medical malpractice," "the magistrate judge denied [that] motion" and the plaintiff "timely objected, thereby preserving the issue for review by the district court," the district court "could not modify or set aside any portion of the magistrate judge's order unless the magistrate judge's decision was 'clearly erroneous or contrary to law'" (citing 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a))).

## BACKGROUND

Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Patrick Clemons ("Plaintiff"), acting pro se,[2] initiated this action against the City of Greensboro (the "City") and Officers L.S. Garrison, J.L. Beavers, N.B. Fisher, V.S. Oxendine, and A.A. Tejada (collectively, "Defendant Officers"), in their individual and official capacities, for their alleged violations of Plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments. (Docket Entry 1 (the "Original Complaint"), ¶ 6.) The Original Complaint further references the North Carolina State Constitution and includes claims for negligence, false imprisonment, and malicious prosecution. (Id., ¶¶ 7, 52–64.) The Original Complaint's allegations relate to an incident on September 22, 2016, involving several officers of the Greensboro Police Department. (See id., ¶¶ 4, 10.) According to the Original Complaint:

On the evening of "September 22, 2016, Plaintiff . . . was having a get together at his house with friends celebrating his birthday and his mother's birthday while watching a football game." (Id., ¶ 10.) Around 8:30 p.m., Defendant Officers arrived at Plaintiff's house, notified Plaintiff they had "received a complaint" (id., ¶ 11) and "remove[d] everyone from the home" to "search [them] for weapons" (id., ¶ 12). While standing in

_____

    2  Plaintiff since has retained counsel. (See Docket Entry 3.)

2

Plaintiff's yard, Defendant Fisher voiced to Defendant Tejada that he "smelled marijuana smoke," but Defendant Tejada stated that he detected "only [] heavy cigarette smoke." (Id., ¶ 13.) Around that time, Defendant Beavers entered Plaintiff's house, without a warrant, to perform a "lockdown." (Id., ¶¶ 14-16.) Defendants Oxendine and Tejada eventually joined Defendant Beavers inside the house to continue the "lockdown." (Id., ¶ 17.)

Defendant Fisher spoke with Plaintiff about the reason for the visit by Defendant Officers. (See id., ¶¶ 19-20.) First, Defendant Fisher told Plaintiff the complaint concerned the use of marijuana. (Id., ¶ 19.) An unidentified officer, while inside Plaintiff's house, asserted that the officers could strengthen the plausibility of that complaint by "light[ing] up a joint in the home." (Id.) Later, Defendant Fisher stated that officers had received a complaint about the sale of narcotics. (Id.) Finally, upon learning from Defendant Tejada after the "lockdown" that the house contained liquor bottles, Defendant Fisher advised Plaintiff that officers had "known for a long time there are complaints [that Plaintiff's residence] was a liquor house." (Id., ¶ 20.) Despite multiple requests, Plaintiff refused to consent to a search of the house. (See id.)

Thereafter, Defendant Fisher left and returned with a "faulty warrant." (Id., ¶ 21.) Defendant Garrison and Defendant Beavers then accompanied Plaintiff (in handcuffs at this point) inside his

3

house and directed him to sit in a particular chair. (Id., ¶ 22.)
Defendant Garrison searched the area where Plaintiff sat and found
a bag of marijuana, which Plaintiff decried as "planted." (Id.)
Upon a further search of Plaintiff's house, Defendant Officers also
found a digital scale, money, and cocaine, all of which Defendant
Officers allegedly planted. (Id., ¶¶ 27-28, 38.) Defendant
Officers discussed some of the above events as they unfolded,
admitting that they knew Plaintiff did not sell drugs and that
Plaintiff's lack of felony convictions "change[d their] plan."
(Id., ¶ 31.)

The Original Complaint also alleges that Defendant Officers
committed other misconduct, to include failing "to read Plaintiff
his Miranda rights" (id., ¶ 29); detaining Plaintiff without
probable cause (id., ¶ 30); discussing a future visit to
Plaintiff's house during which they could "rat f--k him again"
(id., ¶ 32); turning on music to muffle the recording of their
conversations by their body-worn cameras (id.); in the case of one
unidentified officer, turning off his body-worn camera (id., ¶ 34);
using "unreasonable and excessive force" (id., ¶ 36); seizing
firearms from Plaintiff's house and failing to return them (id.,
¶ 39; and promising Plaintiff that his cooperation could "make all
of this go away" (id., ¶ 40).

In connection with the evidence seized from Plaintiff's house,
Plaintiff was charged with "possession of marijuana, possession

4

with intent to sell cocaine, maintaining a dwelling, possession of drug paraphernalia, and possession and sale of alcohol beverage without [a] permit." (<u>Id.</u>, ¶ 23.) Plaintiff faced a period of detention for those charges (<u>id.</u>), before their ultimate dismissal after "Plaintiff . . . mounted a successful defense in criminal court" (<u>id.</u>, ¶ 25). The foregoing events caused Plaintiff to develop a number of physical and mental conditions, including "nightmares, headaches, increased blood pressure, sleeplessness, depression, [and] anxiety." (<u>Id.</u>, ¶ 51.) Additionally, Plaintiff now "fear[s ]living alone" (<u>id.</u>) and has suffered "humiliation" and "loss of income" (<u>id.</u>, ¶ 54).

Based on the those allegations (<u>see id.</u>, ¶ 42), the Original Complaint asserts the following claims: the City failed to train, discipline, and supervise its officers (<u>see id.</u>, ¶¶ 43–46), and Defendant Officers violated Plaintiff's "right . . . to be secure in his person and effects against unreasonable search and seizure" (<u>id.</u>, ¶ 50(a)), his "right . . . to be informed of the nature and cause of the accusation against him" (<u>id.</u>, ¶ 50(b)), and his due-process and equal-protection rights, all in violation of Section 1983 (<u>see id.</u>, ¶ 50(c)); the City "negligently caused injuries" (<u>id.</u>, ¶ 53), including "specific and serious bodily injury[,] pain and suffering[,] emotional distress and psychological injury, great humiliation, loss of income, [and] costs and expenses" (<u>id.</u>, ¶ 54); the City negligently failed to train, supervise, and control its

5

officers (id., ¶¶ 55-59); "[Plaintiff] was falsely imprisoned and handcuffed in his home prior to receipt of the faulty search warrant, and prior to his wrongful arrest and detention" (id., ¶ 60); and Plaintiff's charges, detention, and incarceration constitute malicious prosecution and false/unlawful arrest, in violation of the Fourth Amendment (see id., ¶¶ 61-64).

The City and Defendant Officers (collectively, "Defendants"), pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), moved to dismiss all Section 1983 and negligent failure-to-train claims against the City (or any official-capacity Defendant Officer) and further requested dismissal of any equal-protection claim. (See Docket Entry 9 at 2.) The Court (per United States District Judge Loretta C. Biggs) granted that motion, holding that (i) the Original Complaint lacked sufficient factual allegations against the City to support a Section 1983 claim or a state-law "negligent failure to train claim" (Docket Entry 15 at 1-2), (ii) any Section 1983 claim against a Defendant Officer in his official-capacity would duplicate claims against the City (id. at 6), and (iii) the Original Complaint failed to allege a plausible equal-protection claim against any Defendant (id. at 6-7.) The Court dismissed those claims without prejudice, however, noting Plaintiff's unrepresented status at the time he filed the Original Complaint and cautioning his counsel "that any attempt to

amend Plaintiff's Complaint should be supported by concrete factual allegations and not conclusory statements."  (Id. at 7–8.)

Plaintiff, by counsel and pursuant to Federal Rule of Civil Procedure 15 ("Rule 15"), subsequently filed the Motion to Amend, attaching a proposed amended complaint (Docket Entry 17-1) (the "Amended Complaint").  (Docket Entry 17 at 1.)  The Amended Complaint elaborates upon the Original Complaint's allegations and asserts that (i) Defendant Officers (in their individual capacities) and the City violated Plaintiff's fourth-amendment and equal-protection rights, in violation of Section 1983 (see Docket Entry 17-1, ¶¶ 100–09), (ii) the City maintained unconstitutional customs or policies with respect to the hiring, training, supervision, and discipline of Defendant Officers, in violation of Section 1983 (see id., ¶¶ 110–28), (iii) Defendant Officers searched Plaintiff's residence without a warrant, detained Plaintiff without suspicion, and arrested him without probable cause, in violation of Section 1983 (see id., ¶¶ 129–33), and (iv) Defendant Officers "falsely imprisoned and handcuffed [Plaintiff] in his home prior to receipt of the faulty search warrant and prior to his wrongful arrest and detention" (id., ¶ 135), in violation of "the Constitution and laws of the United States and . . . State Tort Claims Act" (id., ¶ 136).

Defendants opposed the Motion to Amend, arguing that "Plaintiff's proposed amendments as to his direct claims against

7

the City [] and his equal protection claim against all Defendants are insufficient to overcome a subsequent motion to dismiss under Rule 12(b)(6)."  (Docket Entry 18 (the "Response") at 1.)  In particular, according to the Response, the Amended Complaint falls short of plausibly alleging Section 1983 municipal liability, and the equal-protection allegations likewise do not suffice.  (See id. at 4-13.)  Plaintiff's reply maintains that the Amended Complaint adequately alleges both a failure to train and a municipal custom or policy of indifference to potential constitutional violations, for purposes of Section 1983 municipal liability.  (Docket Entry 19 at 4-9.)  The reply further contends that the Amended Complaint's equal-protection allegations survive Rule 12(b)(6) scrutiny.  (Id. at 9-10.)

## DISCUSSION

### I. Relevant Standards

### A. Complaint Amendment

"Under [Rule 15], leave to amend a pleading 'shall be freely given when justice so requires.'"  Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999) (quoting Fed. R. Civ. P. 15(a)).  "[L]eave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile."  Johnson v. Oroweat Foods Co., 785 F.2d 503, 509 (4th Cir. 1986).  "An amendment is futile if the amended claim

would fail to survive a motion to dismiss pursuant to [Rule] 12(b)(6)." Hall v. Greystar Mgmt. Servs., L.P., 637 F. App'x 93, 97 (4th Cir. 2016).

A Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). Accordingly, in reviewing a motion to dismiss, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Ct. of App., 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom. Coleman v. Court of App. of Md., 566 U.S. 30 (2012). The Court must also "draw all reasonable inferences in favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. Id. (citing Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the

9

line between possibility and plausibility of "entitlement to relief."'" Id. (quoting Twombly, 550 U.S. at 557). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

**B. Section 1983 Municipal Liability**

Section 1983 creates municipal liability for constitutional violations "for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479 (1986). The "tortious conduct" that forms the basis of such liability "must be pursuant to a municipality's official policy[, which] distinguish[es] acts of the *municipality* from acts of *employees* of the municipality." Id. (internal quotation marks omitted). "[I]n other words, a municipality cannot be held liable under [Section] 1983 on a *respondeat superior* theory." Monell v. Department of Soc. Servs., 436 U.S. 658, 691 (1978) (italics in original). In that regard:

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

10

_Lytle v. Doyle_, 326 F.3d 463, 471 (4th Cir. 2003) (quoting _Carter_ _v. Morris_, 164 F.3d 215, 217 (4th Cir. 1999)). Moreover, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a _particular_ constitutional or statutory right will follow the decision." _Board of Cnty. Comm'rs v. Brown_, 520 U.S. 397, 411 (1997) (emphasis added).

"When a plaintiff asserts a claim based on inadequate training, the 'complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a deliberate or conscious choice by the municipality, and (3) that the officer's conduct resulted from said training.'" _Smith v. City of_ _Greensboro_, No. 1:19CV386, 2020 WL 1452114, at *11 (M.D.N.C. Mar. 25, 2020) (quoting _Peters v. City of Mount Rainier_, No. 14-955, 2014 WL 4855032, at *5 (D. Md. Sept. 29, 2014)). As far as causation under that theory, a plaintiff must demonstrate a "specific deficiency rather than general laxness . . . in training," and the potential for the specific violation must constitute "a reasonable probability rather than a mere possibility." _Spell v. McDaniel_, 824 F.2d 1380, 1390 (4th Cir. 1987).

To establish a _Monell_ claim based on the fourth theory referenced in _Lytle_, "a custom or usage with the force of law," _Monell_, 436 U.S. at 691, a plaintiff must show

11

that (1) an unconstitutional custom or practice was so
common as to have the force of law, (2) the responsible
policy makers were actually or constructively aware of
its existence, (3) they failed through specific intent or
deliberate indifference to stop the practice, and (4) a
sufficiently close causal link exists between the
unconstitutional practice and the violation of [the]
plaintiff['s] rights.

Massasoit v. Carter, 439 F. Supp. 2d 463, 481 (M.D.N.C. 2006)
(citing Spell, 824 F.2d at 1390-91). A plaintiff must identify the
municipal policy with precision; "[u]nfocused evidence of unrelated
constitutional violations is simply not relevant to the question of
whether a municipal decisionmaker caused the violation of the
specific federal rights of the plaintiff before the court."
Carter, 164 F.3d at 218-19.

### C. Equal Protection

"To succeed on an equal protection claim, a plaintiff must
first demonstrate that he has been treated differently from others
with whom he is similarly situated and that the unequal treatment
was the result of intentional or purposeful discrimination."
Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). The
court then must "determine whether the disparity in treatment can
be justified under the requisite level of scrutiny." Id. A
complaint must "articulate facts demonstrating that a racially
discriminatory intent or purpose was a factor in [the] decisions"
by government actors who allegedly caused the constitutional
violation. Hodge v. Gansler, 547 F. App'x 209, 210 (4th Cir.
2013). Even though "[r]acial epithets . . . do not themselves

12

implicate constitutional rights and cannot, on their own, form the basis of a constitutional claim[,] . . . . [r]acial statements can serve as evidence of discriminatory intent." <u>Harrison v. Prince William Cnty. Police Dep't</u>, 640 F. Supp. 2d 688, 706 (E.D. Va. 2009); <u>see also</u> <u>id.</u> at 697, 706 (denying motion to dismiss when complaint alleged that officer had used racial slur after putting the plaintiff in a headlock, dropping the plaintiff to the ground, and grinding the plaintiff's head into pavement).

## II. Analysis

For the following reasons, the Court will deny in part and grant in part the Motion to Amend. As concerns any equal-protection claim ("Equal-Protection Claim") and any other Section 1983 claims against the City ("Monell Claims"), Plaintiff's proposed amendments fail for futility. However, the Court will grant the Motion to Amend to the extent the Amended Complaint drops the negligence claim against the City and develops the allegations underlying the remaining Section 1983 and false-imprisonment claims against Defendant Officers.

## A. Equal-Protection Claim

Like the Original Complaint, the Amended Complaint's Equal-Protection Claim targets the conduct of both Defendant Officers and the City. (<u>Compare</u> Docket Entry 1, ¶¶ 43, 50(c), <u>with</u> Docket Entry 17-1, ¶ 104.) In particular, the Amended Complaint alleges that Defendant Officers and the City subjected Plaintiff to "unequal

13

treatment" as a result of "intentional and purposeful discrimination" based on his race. (Docket Entry 17-1, ¶ 104). The Amended Complaint also states that the City's "deficient policies, practices and customs" in that regard constitute "deliberate indifference . . . to the constitutional rights of Plaintiff, and other individuals similarly situated," such that the City bears Section 1983 municipal liability. (Id., ¶ 115.)

In support of such claim against Defendant Officers, the Amended Complaint focuses on certain statements by Defendant Officers during the incident at Plaintiff's house. First, when Defendant Garrison arrived, he allegedly asked Plaintiff whether the Thunderbird outside belonged to Plaintiff. (See id., ¶ 23.) The Amended Complaint also states that Defendant Garrison again questioned Plaintiff about his "hotrod vehicles" and "classic cars" while Defendant Officers awaited the search warrant. (Id., ¶ 45.) According to the Amended Complaint, the "premise" that "a black man cannot have nice classic vehicles" motivated Defendant Garrison's questioning. (Id., ¶ 46.) Second, both Defendant Garrison and another unnamed officer allegedly used the term "rat f—k" to refer to their treatment of Plaintiff, in the presence of Defendant Fisher. (Id., ¶ 29, 66.) The Amended Complaint characterizes the term as "demeaning, derogatory, inflammatory and racial." (Id., ¶ 29.) Third, the Amended Complaint alleges that Defendant Officers "assumed Plaintiff was a convicted felon . . . because

14

Plaintiff is a middle-aged black man who Defendant Officers knew had prior offenses and felony charges." (Id., ¶ 53.)

As far as the City's liability for the alleged equal-protection violations, the Amended Complaint asserts that "[t]he [Defendant Officers'] acts and practices . . . [are] so persistent and widespread, against black men in particular, as to constitute a custom or usage with force of law respective to the race classification of Plaintiff, a middle-aged black man." (Id., ¶ 106.) Per the Amended Complaint, the City

> has a history of similar behavior against black citizens that has not been corrected, and has repeatedly been accused of similar misconduct, even deadly misconduct as in the case of Marcus Deon Smith, a black man who was hogtied by [City police] officers and died in their custody. In the Smith matter, the wrongful practices of the culpable officers were not revealed immediately, but rather a cover-up was attempted by then Chief of Police, Wayne Scott.

(Id.) The Amended Complaint invokes other "[i]ncidents of police abuse, misconduct and cover[-]ups by [the City]" (id., ¶ 107), identified as:

> the 1969 . . . siege of A&T, the shooting of Willie Grimes, the 1970 Greensboro Massacre, the 1995 wrongful conviction of Lamont's [sic] Armstrong, the 2009 settlement in the lawsuit brought by then 85 year old Eva foster [sic], the tasing and arrest of Zared Jones, which occurred in September 2016 the same time as Plaintiff's wrongful arrest, and the settlement of Dejuan Yourse, just to name a few.

(Id.) The Amended Complaint further faults the City and alleges deliberate indifference in connection with Defendant Garrison's use of the term "rat f—k" and "the fact that no other officer at any

15

time reflected the courage to correct the behavior and protect the rights of [Plaintiff]." (Id., ¶ 108.)

Neither set of allegations in support of the Equal-Protection Claim against Defendant Officers and the City passes muster under Rule 15 because the Amended Complaint fails to "articulate facts demonstrating that [Defendant Officers acted with a] racially discriminatory intent or purpose," Hodge, 547 F. App'x at 210, during the incident in question. In that regard, the Amended Complaint lacks any plausible connection between Defendant Officers' comments and discrimination on the basis of Plaintiff's status as a black man. As an initial matter, the Court (per Judge Biggs) previously highlighted the "questionable premise" that Defendant Officers' alleged use of the term "rat f—k" "shows racial discrimination because 'rats are not white, they are colored.'" (Docket Entry 15 at 7 (quoting Docket Entry 13 at 10–11).) The Amended Complaint continues to rely on that questionable premise in maintaining that such comments evince racial discrimination. The allegations concerning Plaintiff's vehicles fare no better because Defendant Garrison's questioning, on its face, reveals no discriminatory purpose or intent. (See Docket Entry 17-1, ¶¶ 23, 45.) The Amended Complaint relies on rank speculation to connect Defendant Garrison's inquiries to racial discrimination. (See id., ¶ 46.) Finally, Defendant Officers' allegedly mistaken beliefs about Plaintiff's status as a felon likewise fail to establish

16

their purpose or intent to discriminate against Plaintiff on the basis of his race. In all, the Amended Complaint's allegations fail to "nudge Plaintiff's [Amended] Complaint across the line separating the speculative from the plausible." (Docket Entry 15 at 7 (citing Twombly, 550 U.S. at 570).)

Turning to the portion of the Equal-Protection Claim that inculpates the City, the Amended Complaint's allegations suffer from significant vagueness. It appears that Plaintiff has attempted to allege "a custom or usage with the force of law," Monell, 436 U.S. at 691, such that the City bears liability for any equal-protection violation. However, the Amended Complaint merely suggests that the City maintains a "custom" of a wide range of supposedly racially discriminatory actions, without connecting such conduct to the alleged violations Plaintiff experienced. (See Docket Entry 17-1, ¶¶ 106–07.) For example, a reference to the hog-tying and death of a black man in police custody does not demonstrate that (i) the City's alleged custom of racial discrimination played a role in that incident or (ii) the alleged custom caused any violation of which Plaintiff complains (which include neither hog-tying nor physical injury/death while in police custody). In any event, the Amended Complaint fails to identify a "specific policy with precision," Carter, 164 F.3d at 218–19, in order to hold the City liable. "Unfocused evidence of unrelated constitutional violations is simply not relevant to the question of

17

whether a municipal decisionmaker caused the violation of the specific federal rights of the plaintiff before the court." Id. For those reasons, the Equal-Protection Claim against the City (like such claim against Defendant Officers) fails for futility.

## B. Monell Claims

According to the Amended Complaint, the City "bears [direct] liability [under Section 1983] because its policies, practices and/or customs . . . cause[d] Plaintiff's injuries." (Docket Entry 17-1, ¶ 20). More specifically, the Amended Complaint alleges that such policies or customs include:

> a) Failure to provide adequate training and supervision to police officers with respect to constitutional limits on the use of force, arrest, coercion [and] intimidation, search [and] seizure, detention, and the department[']s written rules and regulations stated herein.
> b) Failure to adequately discipline or retrain officers when misconduct of this nature occurred in the past with non-white citizens;
> c) Selection, retention, and assignation [sic] of officers with demonstrable propensities for excessive force, violence, dishonesty, and other misconduct;
> d) Encouragement of officers in the belief that they can violate the rights of persons, such as Plaintiff, a black man, with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits; [and]
> e) Ratification by the highest levels of authority of the specific unconstitutional acts alleged in this Complaint and, in particular, the ratification of the unlawful search and seizure, unjustified arrest and incarceration of Plaintiff.

(Id.) Elsewhere, the Amendment Complaint adds that the City: failed to provide adequate training and supervision with respect to officers' use of body-worn cameras (see id., ¶ 113(a)); hired and

18

retained officers inclined to "violat[e Plaintiff's] constitutional rights with the intent to deprive him of his classic vehicles" (id., ¶ 113(b)); and declined "to properly investigate claims of unlawful detention and excessive force by [unspecified] City Police Officers" (id., ¶ 113(g) (all-caps font omitted)). Moreover, Monell liability purportedly attaches for Defendant Officers' violations of the City's written policies governing body-worn cameras, reasonableness, and courteousness. (Id. ¶ 113(b); see also id., ¶¶ 71-72, 123, 125 (quoting written policy of Greensboro Police Department).) The Amended Complaint stakes the City's notice of persistent misconduct on the allegedly inadequate supervision and discipline of Defendant Officers, as well as the fact that "Plaintiff's case was dismissed and all charges dropped due to a faulty search warrant." (Id., ¶ 113(d).)

In all, the Amended Complaint asserts two theories of Monell liability: (1) a failure to properly train Defendant Officers; and (2) a practice sufficiently widespread to constitute a "custom or usage with the force of law," Monell, 436 U.S. at 691. (See Docket Entry 19 at 4-9.) Upon review of the allegations supporting each theory, neither variant of the Monell claim against the City passes muster under Rule 15.

(i) Failure to Train

The Amended Complaint generally faults the City's hiring, training, and supervision practices but offers no concrete factual

19

allegations about how the City hired, trained, and supervised Defendant Officers or how such programs (or lack thereof) caused Plaintiff's alleged injuries. For example, the Amended Complaint baldly contends that Defendant Officers evinced a propensity for committing various constitutional violations and that the City possessed knowledge of such propensities but nowhere indicates how those propensities manifested in the past or how the City otherwise ought to have learned about them. (See Docket Entry 17-1, ¶ 113(b)-(c).) Moreover, the Amended Complaint does not (i) identify the City's approach to training officers in the use of body-worn cameras, or (ii) explain how such approach caused any of Plaintiff's alleged injuries. To the extent the Amended Complaint suggests that Defendant Officers' disregard of written City policy contributed to a constitutional violation, the Amended Complaint fatally fails to show that such violations resulted from inadequate training or any other decision attributable to the City. See Smith, 2020 WL 1452114, at *11 (explaining burden to show deliberate choice by municipality and causation between training and officer's conduct). Importantly, respondeat superior cannot establish Section 1983 liability. Monell, 436 U.S. at 691. On the whole, the Amended Complaint merely recites elements and repeats terms of art without supporting a failure-to-train claim with non-conclusory factual matter. For that reason, the Amended Complaint does not adequately allege a Monell claim on that theory.

<u>(ii) Custom or Usage</u>

As with the Equal-Protection Claim against the City, the Amended Complaint fails to demonstrate a "custom or usage with the force of law," <u>id.</u>, that caused any of Plaintiff's other alleged constitutional injuries. For example, the Amended Complaint baldly asserts that the City "maintain[s] an unconstitutional policy, custom and practice of detaining and arresting individuals without probable cause or reasonable suspicion, and using unscrupulous and violative police tactics" (Docket Entry 17-1, ¶ 113(f)). In support of that proposition, the Amended Complaint relies upon "the fact that police brutality against black Americans has persisted for decades and still persisted" at the time of Plaintiff's alleged injuries. (<u>See</u> <u>id.</u>)

Vague allegations of non-specific or unrelated unconstitutional conduct (not attributed to Defendant Officers) could not have placed the City on notice about the risk of Defendant Officers' alleged unconstitutional conduct here. <u>See</u> <u>generally</u> <u>Brown</u>, 520 U.S. at 405 (noting "rigorous standards of culpability and causation" that apply to Section 1983 claims against municipalities). As discussed in the context of Plaintiff's Equal-Protection Claim, "[u]nfocused evidence of unrelated constitutional violations is simply not relevant to the question of whether a municipal decisionmaker caused the violation of the specific federal rights of the plaintiff before the court."

21

<u>Carter</u>, 164 F.3d at 218–19.  Accordingly, Plaintiff has failed to plead specific, non-conclusory factual allegations that would survive Rule 12(b)(6) dismissal.  For that reason, any <u>Monell</u> claim based on the City's alleged custom or usage likewise fails for futility.

**C. Other Claims**

Like the Original Complaint, the Amended Complaint appears to contain a state-law false-imprisonment claim.  (<u>Compare</u> Docket Entry 1, ¶ 60, <u>with</u> Docket Entry 17-1, ¶¶ 134–38.)  Unlike the Original Complaint, however, the Amended Complaint does not lodge a common-law negligence claim against the City.  (<u>Compare</u> Docket Entry 1, ¶¶ 52–54, <u>with</u> Docket Entry 17-1, ¶¶ 1–138.)  To the extent Plaintiff has sought to amend the Amended Complaint to drop his negligence claim against the City, the Court grants that request.

**CONCLUSION**

**IT IS THEREFORE ORDERED** that the Motion to Amend (Docket Entry 17) is **DENIED IN PART**, such that the proposed amendment of the Equal-Protection Claim against all Defendants and any <u>Monell</u> Claim against the City is **DENIED** for futility, and **GRANTED IN PART**, such that Plaintiff may drop the previously asserted negligence claim against the City and add allegations in support of his surviving Section 1983 and false-imprisonment claims against Defendant Officers.

22

**IT IS FURTHER ORDERED** that Plaintiff shall file his Amended Complaint consistent with this Order on or before March 8, 2021.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

March 1, 2021