IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
GREENSBORO DIVISION

### CIVIL ACTION NUMBER: 1:19-cv-00961-LCB-LPA

| | |
|---|---|
| PATRICK CLEMONS, | ) |
| | ) |
| Plaintiff, | ) **FIRST AMENDED COMPLAINT** |
| | ) **FOR DAMAGES** |
| v. | ) |
| | ) |
| THE CITY OF GREENSBORO, aka: | ) |
| DEFENDANT CITY, | ) |
| L.S. GARRISON, in his official & independent | ) |
| capacity; J.L. BEAVERS, in his official & | ) |
| independent capacity; | ) |
| N.B. FISHER, in his official & independent | ) |
| capacity; V.S. OXENDINE, in his official & | ) |
| independent capacity; and A.A. TEJADA, in his | ) |
| official & independent capacity aka: | ) |
| DEFENDANT OFFICERS, | ) |
| Defendants. | ) |
| | ) |

### INTRODUCTION

1.      This case arises out of the unlawful search, seizure, and ultimate arrest of Patrick Clemons. On the evening of September 22, 2016, Plaintiff was targeted, harassed, searched, detained, charged with possession of marijuana, possession with intent to sell cocaine and crack, maintaining a dwelling, possession of drug paraphernalia, sale of alcohol beverages, and was ultimately wrongfully arrested and incarcerated all without lawful cause or legal justification, by City of Greensboro Police Officer L.S. Garrison, J.L. Beavers, N.B. Fisher, V.S Oxendine and A.A. Tejada (collectively "OFFICERS").

2.     This civil rights action seeks compensatory and punitive damages from Defendants for violating various rights under the United States Constitution and North Carolina state law in connection with the unlawful search, seizure, and ultimate arrest of Patrick Clemons.

### *Jurisdiction and Venue*

3.     This action arises Title 42 of the United States Code § 1983.  Title 28 of the United States Code Section 1343 confers jurisdiction upon this Court.  It also arises under the Constitution of the State of North Carolina, particularly Article 1 § 19. The unlawful acts and practices alleged herein occurred in the City of Greensboro, County of Guilford, North Carolina, which is within the judicial district of this Court.

4.     Venue is proper in this Court pursuant to the provisions of 28 U.S.C. § 1391(b) because Defendants are believed to reside in this district and all incidents, events and occurrences giving rise to this action occurred in this district.

### *Jury Demand*

5.     Plaintiff demands a trial by jury on each and every one of the claims as pleaded herein.

### *Parties*

6.     Plaintiff, PATRICK CLEMONS (hereinafter "Plaintiff"), is a middle aged, African American citizen and resides in Greensboro, Guilford County, North Carolina. Plaintiff is well known in his community and known particularly for owning and possessing on his property several classic, vintage restored vehicles.  Plaintiff is unmarried and at the

time of incident lived alone. Plaintiff seeks to recover damages for the violations of his Civil Rights.

7.     Defendant THE CITY OF GREENSBORO (hereinafter "CITY") is now and at all times material to this action, is a municipal corporation, located in Guilford County, North Carolina, duly chartered under the laws of the State of North Carolina, with all corporate powers enumerated in North Carolina General Statute 160A-1, including the right to be sued. Defendant City has possessed the power and authority to adopt policies and prescribe rules, regulations, governs and practice affecting the operation of the Greensboro Police Department ("GDP") and its tactics, methods, practices, customs and usage pursuant to the laws of the State of North Carolina. At all relevant times, Defendant CITY was the employer of DEFENDANT OFFICERS individually and as peace officers.

8.     At all times mentioned herein, Defendant L.S. GARRISON (hereinafter "GARRISON"), is sued in his individual capacity and in his capacity as an officer for GDP. Upon information and belief, Defendant GARRISON is a citizen and resident of Greensboro, Guilford County, North Carolina and at all relevant times was employed as a police officer by the GDP.

9.     At all times mentioned herein, Defendant J.L. BEAVERS (hereinafter "BEAVERS"), is sued in his individual capacity and in his capacity as an officer for GDP. Upon information and belief, Defendant BEAVERS is a citizen and resident of Greensboro, Guilford County, North Carolina and at all relevant times was employed as a police officer by the GDP.

3

10.     At all times mentioned herein, Defendant N.B. FISHER (hereinafter "FISHER"), is sued in his individual capacity and in his capacity as an officer for GDP. Upon information and belief, Defendant FISHER is a citizen and resident of Greensboro, Guilford County, North Carolina and at all relevant times was employed as a police officer by the GDP.

11.     At all times mentioned herein, Defendant V.S. OXENDINE (hereinafter "OXENDINE"), is sued in his individual capacity and in his capacity as an officer for GDP. Upon information and belief, Defendant OXENDINE is a citizen and resident of Greensboro, Guilford County, North Carolina and at all relevant times was employed as a police officer by the GDP.

12.     At all times mentioned herein, Defendant A.A. TEJADA (hereinafter "TEJADA"), is sued in his individual capacity and in his capacity as an officer for GDP. Upon information and belief, Defendant TEJADA is a citizen and resident of Greensboro, Guilford County, North Carolina and at all relevant times was employed as a police officer by the GDP.

13.     At the times herein mentioned, Defendant OFFICERS acted under the color of law, and within the course and scope of their employment with the CITY and the GDP.

14.     At all relevant times, Defendant OFFICERS, individually and as peace officers, were duly appointed officers and/or employees or agents of Defendant CITY, subject to oversight and supervision by Defendant CITY's elected and non-elected officials.

4

15.     In doing the acts and failing and omitting to act as hereinafter described, Defendant OFFICERS, individually and as peace officers, were acting on the implied and actual permission and consent of the Defendant CITY.

16.     At all times mentioned herein, Defendant CITY was the agent of each and every Defendant OFFICER and had the legal duty to oversee and supervise the conduct and employment of each Defendant OFFICER.

## PRELIMINARY ALLEGATIONS

17.     The City of Greensboro is a public entity and is being sued under Title 42 U.S.C. Section 1983 for violations of the Fourth and Fourteenth Amendments of the United States Constitution and under the North Carolina Article 1 Section 19, for the acts and omissions of the DEFENDANT OFFICERS, and each of them, who at the time they caused Plaintiff's injuries and damages were duly appointed, qualified and acting officers, employees, and/or agents of CITY and acting within the course and scope of their employment and/or agency.

18.     Plaintiff alleges that the conduct of each of Defendants deprived him of his constitutional rights and caused Plaintiff to suffer grievous harm.

19.     Each of the Defendants caused and is responsible for the unlawful conduct and resulting harm by, inter alia: personally participating in the conduct; or acting jointly and in concert with others who did so; by authorizing, acquiescing, condoning, acting, omitting or failing to take action to prevent the unlawful conduct; and by ratifying and

5

condoning the unlawful conduct performed by agents and officers under their direction and control.

## FACTUAL BACKGROUND APPLICABLE TO ALL CLAIMS

20.    On or about September 22, 2016, Plaintiff, was having a get-together at his residence where he had resided for four years in the City of Greensboro. He was entertaining friends celebrating his birthday and his mother's birthday while watching a football game.

21.    Around 8:30 pm, the Defendants GARRISON, BEAVERS, FISHER, OXENDINE, and TEJADA approached Plaintiff's home under a "knock and talk" under the pretense they 1) "received a complaint on the house", and 2) "that drugs were being sold."

22.    Upon reaching the front door, Officer GARRISON's first question when he approached the door of Plaintiff's residence was if the Thunderbird parked outside the house belonged to Plaintiff.

23.    Plaintiff was then summoned to the door and told by Defendant OFFICERS "we got a complaint on the house", "smells like marijuana outside your house." Plaintiff asked if they had a warrant. Officer GARRISON replied, "you know we already been out here one time before."

24.    Defendant OFFICERS removed everyone from Plaintiff's home and searched them outside the home in the yard for weapons.

25.    Officer GARRISON said, he "smelled a smell in the front yard." Officer

6

FISHER attempts to enlist the agreement of Officer TEJADA. TEJADA disagrees and says, "… heavy cigarette smoke." Then FISHER recanted and agreed with TEJADA, saying, "it's just smoke."

26.     Officer FISHER had initially said to Plaintiff when he was asking Plaintiff to search the house without a warrant, "there is a smell of marijuana in the front yard and your house is filled with smoke." He further stated, "we're not here for personal use, we're here for sales." As distinctive as marijuana smoke is, the alleged complaint of marijuana being smoked in Plaintiff's residence was not corroborated by all Defendant OFFICERS.

27.     Defendant OFFICERS did not have a warrant. Plaintiff was asked repeatedly to the point of harassment by Defendants GARISON and FISHER to consent to the search. Plaintiff continued to refuse to allow the OFFICERS to search without a warrant.

28.     GARRISON asks Plaintiff, "you don't mind if my man checks real quick, we' ain't gonna rat-fuck you?" This demeaning, derogatory, inflammatory and racial statement is not heard on GARRISON's body cam, rather, he is heard saying this on DEFENDANT TEJADA's camera who was standing on the porch watching the interaction, waiting to perform the illegal "lockdown."

29.     DEFENDANT GARRISON violated standard operating procedures for body cameras by not properly recording this interaction with Plaintiff.

30.     Plaintiff continued to refuse the warrantless search. Despite Plaintiff's numerous refusals, Defendant OFFICERS decide to move forward and conduct what they called a "lockdown."

7

31.     OFFICERS BEAVERS, TEJADA, AND OXENDINE perform what was referred to as a "lockdown" of the house and are in the house nearly five minutes without a warrant. The police department manual at that time gave no protocol or description of the necessary elements required to perform a "lockdown." This action on the part of the DEFENDANT OFFICERS was arbitrary and subjected Plaintiff to abusive police tactics, coercion, and harassment.

32.     FISHER asked TEJADA if there was any additional probable cause when they cleared the house, and TEJADA stated "there are liquor bottles." FISHER stated to Plaintiff when pressuring him to allow them entry into the residence without a search warrant, "we've known for a long time there are complaints this was a liquor house."

33.     During the "lockdown," BEAVERS can be heard saying, "this is a good old fashion liquor house" and also says, "they got it set up like a bar" after FISHER asks for more probable cause.

34.     On erroneous information, belief, presupposition, bias, and prejudice, Defendant OFFICERS assumed Plaintiff set the kitchen up with a half door to facilitate the sale of alcohol and this information was used to obtain the faulty warrant.

35.     However, Plaintiff purchased the home with the kitchen as it was on the day of this incident.

36.     Despite Plaintiff's many refusals of the search without warrant, Defendant OFFICERS realized they must obtain a search warrant to gain access to Plaintiff's

8

residence. Defendant OFFICERS arrived at Plaintiff's home around 8:30pm, and he was detained until they left at around 2:30am.

37.     While bringing Plaintiff inside, BEAVERS noticed people were using their phones to record what was going on. Not wanting to be recorded any longer, Defendant OFFICERS decided to wait for the warrant inside and let everyone else that was in the yard go.

38.     Once inside, GARRISON asked Plaintiff where he wanted to sit. Plaintiff indicated the couch, but BEAVER interjected and said, "this one right here," and GARRISON sat Plaintiff in the recliner, selected by BEAVER. GARRISON went directly to where the marijuana was on the left-hand corner of the recliner. Later, in conversations with Plaintiff, GARRISON agreed that the way he found the weed in the chair BEAVER told Plaintiff to sit in, "looked bad."

39.     Before sitting Plaintiff in the recliner, Defendant OFFICERS grabbed Plaintiff from behind and put handcuffs on him. Defendant OFFICERS told Plaintiff he was being detained, but when asked why, Defendant OFFICERS provided no legally sufficient answer. During this time, Plaintiff had no idea of the reason for his detention. Before entering the house, Defendant OFFICERS had merely told Plaintiff, "let's go in the house and talk."

40.     When he saw the marijuana, Plaintiff immediately stated the marijuana was planted. BEAVERS said to Plaintiff, "see this thing right here, this is called a camera."

9

GARRISON, again injects "if you had given us consent earlier, we'd already be out of your house."

41.     Once inside, Defendant GARRISON, continued to impress upon Plaintiff that if he would have consented to the search Defendant OFFICERS would be gone by now.

42.     GARRISON then remarked, "I told the guys this was going to be more of an alcohol house than a drug house." GARRISON had already been in the house and knew Plaintiff may allow them to search without a warrant based on his prior experience with Plaintiff and the residence. GARRISON wrongfully used intelligence gained in a previous warrantless search to frame Plaintiff of operating a liquor house and maintaining a dwelling.

43.     On information and belief and based on the actions of GARRISON related to him pressuring Plaintiff to allow them access to his home, GARRISON believed Plaintiff would allow another warrantless search.

44.     GARRISON and other Defendant Officers knew Plaintiff liked to celebrate and entertain friends.

45.     GARRISON even stated that it was a year ago when he was at the house before, which would have also been around Plaintiff's birthday.

46.     While waiting for the warrant, GARRISON and Plaintiff engaged in extensive discussions related to Plaintiff's hotrod vehicles when GARRISON abruptly "switched gears" during the conversation to Plaintiff's classic cars.

10

47.    GARRISON asked Plaintiff, "how did you get those cars?" Plaintiff perceived this a racial statement, with the premise being a black man cannot have nice classic vehicles. GARRISON commented on more than one occasion, "nice find man, that's a nice find." He continued, "how you come across that Firebird? That is a beautiful find… that one will be well into the $100,000's." GARRISON continued, "does the Firebird have a 400 in it?" He then went on to ask whether Plaintiff had paperwork on the classic vehicles.

48.    GARRISON also stated that when he was last at Plaintiff's residence, he researched the cars Plaintiff had in the driveway and saw that they sold for from "$30,000 to $100,000."

49.    GARRISON then said, "you got to figure out a plan B so we can stop coming by here." When asked again by Plaintiff why they were even there, GARRISON admitted, "I don't know how we got the complaint."

50.    Then, an unnamed uniformed officer referred to as "SARG" sat down with Plaintiff and told him a warrant was being obtained and the reason they were there was because, "they got a call from the neighbors who were upset…" The quality of the audio on the recording was poor at this point, so the remaining verbiage could not be made out.

51.    "SARG" went on to say, "if you want to move this process along, you can sign a written consent for us to search the place to get it over and done with." This is after Plaintiff had made it expressly clear many times that he would not consent to a search.

52.     A search warrant arrived at nearly 1:30am. When Defendant OFFICERS found out that the warrant was on its way, they permitted Plaintiff to go out to the porch to smoke a cigarette, but did not remove Plaintiff's handcuffs. Prior to finding out the warrant was en route, Defendant OFFICERS did not permit Plaintiff to leave the room or use the restroom. Plaintiff feared for his life if he did not comply with the demands of Defendant OFFICERS. Plaintiff's friends also feared for his safety, as he was alone with Defendant OFFICERS in the house. However, Defendant OFFICERS would not permit Plaintiff's friends to come into the house to check on Plaintiff.

53.     When the warrant arrived, Defendant OFFICERS were in the house for less than 30 minutes conducting the search.

54.     After the search warrant arrived, Defendant OFFICERS can be heard during the search on various body cam videos discussing "the plan" and how "the plan" would need to be altered following certain events that unfolded.  FISHER stated, "Well with two guns, I don't believe we'll be able to go with the original plan." "Pretty sure, he's a felon."

55.     On erroneous information, belief, presupposition, bias, and discrimination, Defendant OFFICERS assumed Plaintiff was a convicted felon. OFFICERS believed this because Plaintiff is a middle-aged black man who Defendant OFFICERS knew had prior offenses and felony charges. During Defendant OFFICERS' search two guns were found, one in the kitchen and one in the bedroom.

56.     If Plaintiff had been a convicted felon, finding the two guns in his home, would mean an automatic felony under the law. On erroneous information, belief,

12

presupposition, bias, and prejudice, when asked by other Defendants whether Plaintiff was a felon, Officer BEAVERS stated, "I'm pretty sure, he's been charged with a bunch."

57.    On information and belief, Officer FISHER stated "He's got some felony charges. I need to make sure he was convicted." "I'm a run out here and just make sure he's a felon... convicted... call records right quick, so I'll know what our plan is when we get done here."

58.    FISHER ran a check on Plaintiff and the two guns. The guns came back clean, and Plaintiff did not have any felony convictions.

59.    After finding Plaintiff was not a felon, Officer FISHER stated, "this changes our plan."

60.    On information and belief, a witness overheard Defendant OFFICERS on the lawn discussing how they knew Plaintiff did not sell drugs.

61.    Before the warrant arrived, Officer BEAVERS, OXENDINE and TEJADA were in the home performing the "lockdown."

62.    On information and belief Defendant OFFICERS, could not provide a viable and consistent reason for the knock and talk, or probable cause to search Plaintiff's home. Officer FISHER initially stated to Plaintiff the reason for the knock and talk was due to a complaint on the house and that narcotics were being sold. But the marijuana smoke could not be corroborated by Defendant OFFICERS.

63.    DEFENDANT OFFICER FISHER stated, "If the officers light up a joint in the home it would bolster the claim about weed being smoked in the house."

13

64.     FISHER finally returned at 12:51 am with a warrant signed by magistrate

M.B. Moore. FISHER read the faulty warrant to Plaintiff while Plaintiff was seated on the

porch. There is no camera footage of Plaintiff being moved from the recliner to the porch.

GARRISON was the Officer assigned to Plaintiff from the time he was escorted back into

the house following the "lockdown." GARRISON violated policy by not having his camera

operating at all times.

65.     DEFENDANT OXENDINE's camera was also not eye level during the time

he was in Plaintiff's residence during the unlawful "lockdown." The recording is mostly of

the upper wall and ceiling. Once DEFENDNAT OXENDINE exited the home following

the "lockdown," he recorded mostly trees.

66.     Defendant OFFICERS continued their search and allegedly found cocaine

and crack under the kitchen refrigerator, $707.69 cash, a digital scale, all of which Plaintiff

alleges were planted, and two firearms which he admits having possession of.

67.     No Defendant OFFICER'S video footage proves any Officer conducting this

illegal search found cocaine and crack under the refrigerator. Had cocaine and crack been

found in the residence of Plaintiff, it would have been captured on video by the Officer

who found it. The DEFENDANT OFFICERS who cleared the kitchen were FISHER and

the unnamed uniformed officer called "SARG". Neither of their video footage show the

finding of crack and cocaine under the refrigerator.

68.     On information and belief, while helping bag evidence in the kitchen, the

unnamed, uniformed Officer can be heard telling FISHER, "Charge him with maintaining

14

a dwelling, take out a warrant for that, can't do anything tonight, but come back and rat fuck him later." FISHER agreed with this statement made by the unnamed, uniformed Officer.

69.     On information and belief, the unnamed uniformed officer referred to as "SARG" then put a CD in the CD player and turns on music to dampen their voices. FISHER asks, "what's that?" "Sarg" responds, "house music." On this same video, an Officer can be heard in the background again asking, "Is he a felon?"

70.     This behavior of turning the music on and off by the unnamed officer referred to as "Sarg" repeated three times. This action on the part of this Officer made it difficult to hear what was transpiring throughout the investigation and was obstructive in nature. There was no valid reason to turn the music on.

71.     During the bagging of evidence in the kitchen, FISHER asks the unnamed officer if Plaintiff was the guy who came through a driving while intoxicated (DWI) checkpoint a few weeks ago with a Nova.

72.     DEFENDANT BEAVERS violated the policies of Defendant CITY and the GDP when he negligently operated his camera when he failed to properly adjust his camera. BEAVERS camera was misaligned and recorded the ceiling and door post wall for twelve minutes. At one point BEAVERS speaks directly to Plaintiff and his camera is still recording the ceiling.

73.     The GDP policy states:

"The Body Worn Camera (BWC) shall be activated prior to arrival at a call for service, . . .: It further states, under 51.11.5 A ". . .once the BWC is activated, officers will continue to record until the conclusion of their involvement in an event. In most situations conclusion of involvement in an event is signified by leaving the scene. . .. officers must indicate on the BWC recording their reason for deactivating prior to ending the recording."

74. According to the department manual Body Worn Cameras "are utilized by officers to promote transparency and accountability for officers and the community through objective evidence."

75. The unnamed Officer also violated the policies of Defendant CITY and the GDP when he negligently deactivated his Body Worn Camera ("BWC") three times in the middle of an active investigation. This unnamed Officer was recorded saying he is turning his camera off and gave no valid reason for why he is deactivating his camera during on ongoing investigation

76. When the Officers were leaving Plaintiff's residence, Officer FISHER said to him, "if you come work for us, we'll make all this go away." After allegedly finding cocaine and crack in Plaintiff's residence, Defendant OFFICERS instructed Plaintiff that they were not going to arrest him that night, but that he could come down to the GPD and pick his paperwork up in a few days.

77. Plaintiff was charged with Possession with Intent to Sell or Deliver Cocaine, Possession of Marijuana, Maintaining a Dwelling Place, Possession of Drug Paraphernalia and Possession/Sell Alcoholic Beverage without a Permit. Plaintiff was never Mirandized

16

nor was he immediately arrested in connection with this illegal search and seizure. Plaintiff eventually went to the station several days later, was processed, and immediately released.

78.    Plaintiff mounted a successful defense in court and all charges filed against him were summarily dismissed.

79.    Plaintiff had not committed any crimes. Plaintiff was simply hosting a celebratory gathering at his house. Defendant OFFICERS, individually and as peace officers, had neither reasonable suspicion to detain Plaintiff, nor at any time had probable cause to search his property or make an arrest.

80.    Defendant OFFICERS, individually and as peace officers, while acting in the course and scope of their employment with the CITY, negligently assessed the circumstances presented to them and abusively and with coercion and intimidation confronted Plaintiff without having probable cause to believe that Plaintiff had committed a crime or would commit a crime in the future.

81.    Throughout this unlawful search and investigation, Defendant OFFICERS, individually and as peace officers purposely ignored Plaintiff's demands not to enter his home without a warrant, to be released from handcuffs, to leave his home, and ensured his friends stayed outside when they sought assurance Plaintiff was not being harmed.

82.    Defendant OFFICERS, individually and as peace officers continued to subject him to a course of cruel and unusual punishment by falsely imprisoning him in his home, obtaining a faulty, invalid warrant in order to gain access to search his home, whereby they then planted drugs, money, and a digital scale.

83.     Defendants acted with actual malice of forethought toward Plaintiff, and with willful and wanton indifference to and deliberately disregard the statutory and constitutional rights of Plaintiff.

84.     The acts of Defendant OFFICERS constitute unreasonable and excessive use of force, deprivation of liberty, and punishment without due process of law. By reason of the foregoing, Plaintiff was deprived of his liberty and punished without due process of the law. This search was conducted in an abusive, unlawful manner because evidence was planted in the Plaintiff's home and therefore, wrongfully detained without probable cause. The Defendant OFFICERS'S intent and purpose was to humiliate, embarrass him, make him a felon and ultimately seize his classic hotrod vehicles.

85.     At no time during the course of these events did Plaintiff pose any reasonable threat of violence to the defendant officers or any other individual, nor did he do anything to justify the use of excessive, unreasonable, unlawful and unnecessary force against him, by the Defendant OFFICERS.

86.     The actions and omissions of Defendant CITY and Defendant OFFICERS was objectively unreasonable under the circumstances, without legal justification or other legal right, done under color of law, within the course and scope of their employment as law enforcement officers and/or or public officials, and consistent with unconstitutional and negligent acts.

87.     Plaintiff, on information and belief, complains that Defendant OFFICERS and/or each of them, have individually and/or while acting in concert with one another,

18

engaged in a repeated pattern and practice of harassment, abuse, targeting, deceitfulness, prejudice, arbitrary and/or unreasonable force against Plaintiff, a middle-aged black man.

88. Plaintiff complains that Defendant CITY knew or had reason to know by way of actual or constructive notice of the aforementioned culture, pattern and/or practice and had reason to know or should have known of the complained negligent, abusive conduct and resultant injuries and violations enacted on Plaintiff, a middle-aged black male by Defendant OFFICERS.

89. At all material times, and alternatively, the actions and omissions of each Defendant OFFICER were conscious, shocking, reckless, deliberately indifferent to Plaintiff's rights, and were negligent and objectively unreasonable.

90. Plaintiff, on information and belief, allege that Defendant CITY, breached their duty of care to the public in that it failed to discipline Defendant OFFICERS. Their failure to discipline Defendant OFFICERS demonstrates the existence of an entrenched culture, policy or practice of promoting, tolerating and/or ratifying with deliberate indifference the making of improper detentions and arrests, the use of excessive force and the fabrication of official reports to cover up misconduct.

## **ADDITIONAL RELEVANT UNDERLYING FACTS**

91. In addition to the facts outlined herein, Plaintiff adds reference of the consistent harassment, embarrassment, and indifference perpetrated upon him by virtue of the Defendant OFFICERS' actions.

92.     The pattern of abusive behavior towards Plaintiff, a middle aged, black man, is evidenced by at least two other charges where Plaintiff was, harassed, wrongfully arrested, and misidentified. Defendant OFFICERS speaking of Plaintiff's criminal history in an assuming and definitive nature, as if based on the information and knowledge gained of Plaintiff they knew or had strong suspicion he was a felon. Defendant OFFICERS maintained a course of action against Plaintiff for several hours before discovering he was not a convicted felon.

93.     Plaintiff maintains he has been harassed and targeted by Defendant CITY's employees on more than this occasion. Plaintiff was also previously charged with a DWI and a shooting. The DWI also occurred at his residence on his birthday when he was moving his classic cars around in his own driveway. The shooting incident occurred a few months prior to this instant arrest. Both the DWI and the shooting charges were also dismissed.

## **DAMAGES**

94.     As a proximate result of Defendant OFFICERS' conduct, Plaintiff suffered wrongful detention and arrest. As a further proximate result of Defendants' conduct, Plaintiff suffered physical injury, emotional distress, fear, terror, anxiety, humiliation, and a loss of sense of security, dignity, and pride.

95.     By reason of the conduct of Defendants, Plaintiff developed a number of conditions to include insomnia, anxiety, high blood pressure, lack of focus, loss of

20

appetite, headaches, depression, fear, and general dysfunction resulting from the Defendant OFFICERS in their official capacity as employees of the Defendant CITY.

96.     Plaintiff has been diagnosed with Adjustment Disorder with Anxiety as a result of the proximate actions and cause Defendant OFFICERS in their independent capacity and as employees of the Defendant CITY.

97.     Plaintiff suffers from maladjustment stemming from his tormenting experience with Defendant OFFICERS to the degree Plaintiff has extreme fear of residing alone.

98.     Plaintiff moved out of his residence shortly following the arrest, and now resides with a family member for fear of living alone and the Defendant OFFICERS returning.

99.     By reason of the conduct of the Defendant OFFICERS, Plaintiff, a middle-aged black man, suffered loss of reputation and loss of business opportunities.

100.    Plaintiff has been self-employed for over the 30 years and performs work in the residences of his clients. To be charged with the sale of narcotics caused loss of business opportunities and loss of a reputation.

101.    The conduct of Defendant OFFICERS in their independent capacity and as employees of the Defendant CITY was malicious, wanton, and oppressive. Plaintiff is therefore entitled to an award of punitive damages against said Defendant Officers.

## FIRST CLAIM
### VIOLATION OF CONSTITUTIONAL RIGHTS UNDER §1983
*(Plaintiff Patrick Clemons against Defendant Officers (Independent Capacity))*

102.    Plaintiff hereby re-alleges and incorporates by reference paragraphs 1 through 101 above of this Amended Complaint.

103.    Defendant OFFICERS in their independent capacity acted with unjustified conduct by depriving Plaintiff of his liberty interest to be secure in his person against unreasonable searches and seizures, as guaranteed to Plaintiff under the Fourth Amendment to the United States Constitution and applied to state actors by the Fourteenth Amendment.

104.    All Defendant OFFICERS acted in concert to bring about an unreasonable search and seizure upon Plaintiff. All Defendant OFFICERS' actions were biased, unwarranted, malicious, and unlawful and thus deprived Plaintiff of his right to be free from unreasonable searches and seizures under the Fourth Amendment and applied to state actors by the Fourteenth Amendment.

105.    The conduct of all Defendant OFFICERS was willful, wanton, malicious and done with reckless disregard for the rights and safety of Plaintiff, a middle-aged black man.

106.    All Defendant OFFICERS acted to deprive Plaintiff of his constitutional protection under the law to exercise his right to life, liberty, and property under the Fourth Amendment and applied to state actors by the Fourteenth Amendment.

107.    Had DEFENDANTS "plan" gone in accordance with what the facts of this unlawful arrest suggest, Plaintiff would have become a convicted felon by way of the sale of narcotics and would have been relieved of his classic, vintage car collection, which was

22

the topic of numerous conversations by Defendant OFFICERS GARRISON and FISHER from the moment they arrived at Plaintiff's residence until the investigation ended.

108.   The statements of the unnamed, uniformed officer referred to as "SARG" and Defendant GARRISON'S statement that they could take the liberty of rat-fucking Plaintiff "again" whenever they pleased and Defendant FISHER agreeing with the statement made by the unnamed officer, coupled with the fact that no other officer at any time reflected the courage to correct the behavior and protect the rights of this black male citizen, manifests deliberate indifference on the part of all Defendant OFFICERS.

109.   As a direct and proximate result, Plaintiff was forced to endure extreme pain and suffering as well as loss of earning capacity.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CLAIM
### VIOLATION OF CONSTITUTIONAL RIGHTS UNDER §1983 – DETENTION AND ARREST
*(Plaintiff Patrick Clemons against Defendant Officers)*

110.   Plaintiff hereby re-allege and incorporates by reference paragraphs 1 through 109 above of this Amended Complaint.

111.   At the time Defendant OFFICERS performed their unlawful searched and seizure, Plaintiff, Defendant OFFICERS did not have reasonable suspicion to justify the detention, nor did they have probable cause to make an arrest. Defendant assumed they smelled marijuana smoke, then later confirmed it was not marijuana smoke.

112.   Defendant OFFICERS asked to be allowed to search Plaintiff's home repeatedly and Plaintiff repeatedly refused.  Despite refusal, they unlawfully searched

23

Plaintiff's home without warrant, violating Plaintiff' constitutional rights' under the Fourth Amendment of the United States Constitution.

113.    Defendant OFFICERS held Plaintiff detained for hours, and he was not free to leave. Plaintiff feared for his life.

114.    The conduct of Defendant OFFICERS was willful, wanton, malicious and done with reckless disregard for the rights and safety of Plaintiff.

115.    As a direct and proximate result, Plaintiff was forced to endure extreme pain and suffering as well as loss of earning capacity.

### THIRD CLAIM
#### NEGLIGENCE
*(Plaintiff Patrick Clemons against Defendant Officers (Independent Capacity) and Defendant City)[1]*

116.    Plaintiff hereby re-allege and incorporates by reference paragraphs 1 through 115 above of this Complaint.

117.    Defendant CITY owed Plaintiff a duty of care in the form of responsible training and supervision of Defendant OFFICERS.

118.    Defendant CITY owed Plaintiff a duty of care in the form of a guarantee of reasonable safety and freedom from abuse from Defendant OFFICERS.

---

[1] Plaintiff's negligence claim against Defendant City was inadvertently excluded from the Amended Complaint attached to the Motion to Amend, which may have given this Honorable Court the mistaken impression Plaintiff sought to dispense with his common law negligence claim against Defendant City. This was not Plaintiff's intention; therefore, it is being re-asserted herein.

119.    Defendant CITY owed a duty to Plaintiff to train and supervise and otherwise control its police officers in the use of coercion, intimidation, violation of constitutional guarantees and other matters incidental to the exercise of police functions.

120.    Defendant CITY failed to provide adequate training, supervision, and control of police officers described herein, which failure constitutes negligence.

121.    Defendant CITY breached those duties.

122.    Defendant OFFICERS owed Plaintiff a duty of care in the form of respectful, lawful conduct.

123.    Defendant OFFICERS owed Plaintiff a duty of care in the form of reasonable law enforcement performance undertaken without violating state laws, federal laws, Department practices, and the United States and state constitutions.

124.    Defendant CITY negligently caused injuries, emotional distress and damage to Plaintiff. The acts and conduct of Defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of North Carolina.

125.    Likewise, Defendant OFFICERS breached their duties to Plaintiff.

126.    Defendant OFFICERS negligently caused injuries, emotional distress and damage to Plaintiff. The acts and conduct of Defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the laws and Constitution of the State of North Carolina.

25

127. As a result of the foregoing, Plaintiff suffered specific and serious bodily injury; pain and suffering. emotional distress and psychological injury, great humiliation, loss of income, costs and expenses and was otherwise damaged and injured.

128. As a proximate result of Defendant City failure to provide adequate training supervision and control over officers of the Greensboro Police Department, Plaintiff has sustained permanent injuries and will continue to incur additional expenses. These injuries have caused and will continue to cause Plaintiff pain and suffering.

129. Defendant CITY failed to provide adequate training and supervision to its police officers constitutes a willful and wanton indifference and deliberate disregard for human life and the rights of private citizens, including Plaintiff. Plaintiff is thus entitled to punitive damages.

130. On information and belief, Defendant OFFICERS's conduct, individually and as peace officers were ratified by CITY's police department.

131. Defendant CITY has a history of similar negligent behavior against black citizens that has not been corrected, and has repeatedly been accused of similar misconduct, even deadly misconduct as in the case of Marcus Deon Smith, a black man who was hogtied by GPD officers and died in their custody. In the Smith matter, the wrongful practices of the culpable officers were not revealed immediately, as in Plaintiff's case.

132. Incidents of police abuse, negligence, misconduct and cover ups by GPD go back to the 1969 GPD and National Guard siege of A&T, the shooting of Willie Grimes, the 1970 Greensboro Massacre, the 1995 wrongful conviction of Lamont's Armstrong, the

26

2009 settlement in the lawsuit brought by then 85-year-old Eva foster, the tasing and arrest of Zared Jones, which occurred in September 2016 the same time as Plaintiff's wrongful arrest, and the settlement of Dejuan Yourse, to name a few.

133. On information and belief, Defendant OFFICERS' were not disciplined for their wrongful, negligent conduct.

134. By reason of the aforementioned policies and practices of Defendant OFFICERS, individually and as peace officers, Plaintiff was severely injured and subjected to pain and suffering and loss of earning capacity for which Plaintiff is entitled to recover damages.

135. Defendant OFFICERS, individually and as peace officers, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the conduct paragraphs above. Despite having knowledge as stated above these defendants condoned, tolerated and through actions and inactions thereby ratified such conduct. Said Defendants also acted with deliberate indifference to the foreseeable effects and consequences of this conduct with respect to the constitutional rights of Plaintiff, and other individuals similarly situated.

136. By perpetrating, sanctioning, tolerating and ratifying the outrageous conduct and other wrongful acts, Defendant OFFICERS, individually and as peace officers, acted with an intentional, reckless, and callous disregard for Plaintiff. Each of their actions was willful, wanton, oppressive, malicious, fraudulent, and extremely offensive and unconscionable to any person of normal sensibilities.

27

137. Greensboro Police Department Directives Manual states, "a police officer will use responsibly the discretion vested in his position and exercise it within the law. The principle of reasonableness will guide the officer's determinations, and the officer will consider all surrounding circumstances in determining whether any legal action shall be taken."

138. The Defendant OFFICERS in their official capacity did not conduct themselves reasonably when they targeted Plaintiff, a middle-aged black man, with the intention of framing him for a felony with the hope of gaining access to his classic cars, which were mentioned on numerous occasions by GARRISON and FISHER from the beginning of the interaction with Plaintiff until the end.

139. If Plaintiff had been convicted of intent to distribute drugs, which Defendant OFFICERS attempted to frame him for, the classic vehicles he possessed would have been seized by the government and could have been procured by Defendant OFFICERS GARRISON and FISHER, as they were the two officers most interested in Plaintiff's classic vehicles as the facts suggested.

140. It was unreasonable to "lockdown" the house when TEJADA, who can be seen in video footage surveying the house and being directly at the door when party goers came out, said he only smelled cigarette smoke.

141. It was unreasonable to "lockdown" the house when it became known that Plaintiff was celebrating the birthdays of himself and his mother and having a football party.

28

142.   The Greensboro Police Department Directives Manual 1.5.2 states, "Employees will be courteous and tactful in the performance of their duties or while representing themselves as members of the GPD and that in performing their duties, employees will not express any prejudice concerning race, religion, national origin, sex, or other personal characteristics." Defendant OFFICERS failed to perform in accordance with these written regulations.

143.   Based on the actions, deeds, and words of Defendant OFFICERS, Defendant CITY negligently failed to properly train its employees in courteous and tactful behavior.

144.   The Greensboro Police Department Directives Manual states, "consistent and wise use of discretion, based on professional policing competence, will do much to preserve good relationships and retain the confidence of the public. It is important to remember that a timely word of advice rather than arrest--which may be correct in appropriate circumstances--can be a more effective means of achieving a desired end." Defendant OFFICERS failed to perform in accordance with these written regulations.

145.   Based on the actions, deeds, and words of Defendant OFFICERS, Defendant CITY failed to properly train its employees in professional policing competence and how to preserve good relationships and retain confidence in the public. Instead, Plaintiff feared so much for his life that soon after this incident he moved in with his mother and has lived with her since for fear of being, "rat-fucked" by the police and continually harassed, which has been a pattern of behavior against black men by police departments across the country.

146.     By reason of the aforementioned acts and omissions of Defendant OFFICERS, individually and as peace officers, and as proximate result Plaintiff has suffered specific and serious bodily injury; pain and suffering. emotional distress and psychological injury, great humiliation, loss of income, costs and expenses and was otherwise damaged and injured.

147.     Accordingly, Defendant OFFICERS, individually and as peace officers, and Defendant CITY, each are liable to Plaintiff for compensatory and punitive damages.

WHEREFORE, Plaintiff pray for relief as hereinafter set forth.

## FOURTH CLAIM
### FALSE IMPRISONMENT
*(Plaintiff Patrick Clemons Against Defendant City of Greensboro and Defendant Officers)*

148.     Plaintiff hereby re-allege and incorporates by reference paragraphs 1 through 147 above of this Amended Complaint.

149.     Plaintiff was wrongfully charged with possession of marijuana, possession with intent to sell cocaine, maintaining a dwelling, possession of drug paraphernalia, and possession and sale of alcohol beverage without permit and was falsely imprisoned and handcuffed in his home prior to receipt of the faulty search warrant and prior to his wrongful arrest and detention.

150.     Defendant OFFICERS' above-described conduct constituted interference, and attempted interference, by threats, intimidation and coercion, with the Plaintiff's enjoyment of rights, including but not limited to his right to be free from unreasonable

30

searches and seizures, to be free from state actions that shock the conscience, and to life, liberty, and property, secured by the Constitution and laws of the United States and is in violation of State Tort Claims Act (STCA).

151.    In addition to their unlawful restraint of Plaintiff, Defendant OFFICERS used force and the threat of force to maintain Plaintiff's restraint, and Defendant OFFICERS restrained Plaintiff against his will.

152.    Defendant CITY, through the Greensboro Police Department, tolerated this behavior by Defendant OFFICERS against Plaintiff and is thereby another cause of Plaintiff's harm.

153.    Plaintiff has a Fourth Amendment right to be free from unreasonable seizure and free from prosecution without probable cause.

WHEREFORE, Plaintiff pray for relief as hereinafter set forth.

## PRAYER

WHEREFORE, Plaintiff prays for relief, as follows:

1.    For general damages in a sum to be determined according to proof;

2.    For special damages, including but not limited to, past, present and/or future wage loss, income and support, medical expenses and other special damages in a sum to be determined according to proof;

3.    For punitive damages and exemplary damages in amounts to be determined according to proof as to Defendants ;

4.    For reasonable attorney's fees pursuant to 42 U.S.C. § 1988 and 29 U.S.C. § 794a;

5.    For cost of suit herein incurred;

31

6.    For all such other and further relief as the Court deems just and proper.


Respectfully Submitted, this the 8th day of March, 2021


/s/ _____
        *Victoria Broussard*

Victoria Broussard
N.C. SBN: 54095
Tx SBN: 24053882
Attorney for Plaintiff

**The Law Offices of Victoria Broussard**
P.O. Box 4445
Lago Vista, Texas 78645
Ph: 512-963-7094
Fx: 512-672-7052
Email*:* victoria@broussardlegal.com


## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing, "First Amended Complaint for Damages" was electronically filed with the Clerk of the Court via the Court's CM/ECF System, which will notify and electronically serve a duplicate copy on Counsel for all Defendant's on this 8th day of March, 2021.


*Victoria Broussard*

32

/s/ _____

Victoria Broussard

N.C. SBN: 54095

Tx SBN: 24053882

Attorney for Plaintiff


**The Law Offices of Victoria Broussard**

P.O. Box 4445

Lago Vista, Texas 78645

Ph: 512-963-7094

Fx: 512-672-7052

Email*:* victoria@broussardlegal.com

33